**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**ANTHONY WRIGHT and KAREN WRIGHT,**

**Plaintiffs,**

**v.**

**THOMAS F. LOGAN, III, d/b/a SUNSHINE CUSTOM BUILDERS, d/b/a SUNSHINE LEASING, LLC, THOMAS F. LOGAN a/k/a THOMAS LOGAN, JR., and SUNSHINE CUSTOM BUILDERS, INC.**

**Defendants.**
**____________________________________________/**

**Case No.: 6:08-cv-1538-Orl-35GJK**

**DEFENDANTS' CONSOLIDATED MOTION FOR SUMMARY JUDGMENT, MEMORANDUM OF LAW AND SUPPORTING EVIDENCE AGAINST PLAINTIFFS IN CONNECTION WITH THE THIRD AMENDED COMPLAINT**

## I. Introduction

**COMES NOW**, Defendants, **THOMAS F. LOGAN, III, THOMAS LOGAN, JR.**, **and SUNSHINE CUSTOM BUILDERS, INC.,** by and through the undersigned attorney, and files Defendants' Consolidated Motion for Summary Judgment, Memorandum of Law and Supporting Evidence against Plaintiffs with Connection with the Plaintiffs' Third Amended Complaint. The following causes of action or counts have been brought by the Plaintiffs against the corporate Defendant and its shareholders and officers Thomas F. Logan, III and Thomas F. Logan, Jr.: (1) Conversion; (2) Fraudulent Inducement (Draw Payment); (3) Civil Theft (Draw Payment); (4) Civil Theft (Illegal

Disbursements); (5) Civil Theft (Misapplication of Construction Funds); (6) Breach of Leaseback Agreement; and (7) Discharge of a Lien.

In each of the causes of action or count except for the 6th and 7th causes of action, an element of deceit and or dishonesty is alleged in the Plaintiffs' Third Amended Complaint against the individuals. As the undisputed facts and evidence will show, at no time has Thomas F. Logan III, Thomas F. Logan, Jr., or Sunshine Custom Builders, Inc (hereinafter referred to at all times as "Sunshine"), engaged in any deceitful, fraudulent, dishonest, or illegal activity that would warrant the piercing of the corporate veil pursuant to Dania Jai-Alai Palace, Inc. v. Sykes, 450 So.2d 1114 (Fla. 1984). As the undisputed will show, facts and evidence will show the Plaintiffs' have no material evidence to support the essential elements associated with each of the causes of action alleged and described above. In addition, Sunshine has not engaged in any deceitful, dishonest, fraudulent, or illegal activity, itself. Accordingly, after reviewing all of the undisputed facts and evidence set forth herein and below, this court should dismiss each and every cause of action against the individuals and Sunshine.

## II. Undisputed Statement of Facts

### A. Evidence Relied Upon by Defendants

In support of Defendants, Thomas F. Logan, III Thomas F. Logan, Jr. and the Sunshine's Motion for Summary Judgment, the following evidence will be relied upon. The undisputed evidence includes Thirty Exhibits and or depositions which are as follows:

1) The sworn Declaration of Thomas F. Logan III which is attached as Exhibit No.1

2) Attached hereto as Exhibit No.2 is a true and accurate copy of the deposition of Sean Barrett. The former manager of sales for Reunion Resort and Club.

3) Attached and incorporated as Exhibit No. 3 is a true and correct copy of the deposition of Jana Kaminski, the authorized representative of Amera Mortage, Inc. (hereinafter, "Amera") who was in charge of the distribution of construction draws concerning Lot 29, and the alleged misconduct with respect to the 85,000.00 issue central to each of the first five causes of action.

4) Attached hereto as Exhibit No.4 is a true and correct copy of the original deposition of Anthony Wright.

5) Attached hereto as Exhibit No.5 is a true and correct copy of the original deposition of Karen Wright.

6) Attached hereto as Exhibit No.6 is a true and correct copy of the contract for Lot 30.

7) Attached hereto as Exhibit No.7 is a true and correct copy of the contract for Lot 29.

8) Attached hereto as Exhibit No.8 is a true and correct copy of the $ 75,000.00 check made payable to Anthony Wright from Sunshine Custom Builders Inc. as a full release for all cause of action for Lot 29.

9) Attached hereto as Exhibit No.9 is a true and correct copy of the Change Order in addition to the sales price of $ 100,000.00 for Lot 29.

10) Attached hereto as Exhibit No.10 is a true and correct copy of the Plaintiffs' application for a loan and mortgage from Amera for Lot 29.

11) Attached hereto as Exhibit No.11 is a true and correct copy of the e-mail from Debbie Julian, the Director of Architecture Control for Reunion Resort and Club.

12) Attached hereto as Exhibit No.12 is a true and correct copy of the letter from James A. Murray, the Acting Osceola County Engineer, stating Maintenance Bon was accepted for the completion of Reunion West Community.

13) Attached hereto as Exhibit No.13 is a true and correct copy of the lien filled by Frutrell Custom Pools.

14) Attached hereto as Exhibit No.14 is a true and correct copy of the lien filled by Cross Electric.

15) Attached hereto as Exhibit No.15 is a true and correct copy of the lien filled by Sunshine Custom Builders Inc.

16) Attached hereto as Exhibit No.16 is a true and correct copy of the State Contractors License of Thomas F. Logan, III and Sunshine Custom Builders, Inc.

17) Attached hereto as Exhibit No.17 is a true and correct copy of foreclosure case 2008 CA 010955 filed in Osceola County Public Records.

18) Attached hereto as Exhibit No.18 is a true and correct copy of foreclosure case 2008 CA 0121137 filed in Osceola County Public Records.

19) Attached hereto as Exhibit No.19 is a true and correct copy of foreclosure case 2008 CA 006115 filed in Osceola County Public Records.

20) Attached hereto as Exhibit No.20 is a true and correct copy of foreclosure case 2008 CA010601 filed in Osceola County Public Records.

21) Attached hereto as Exhibit No.21 is a true and correct copy of foreclosure case 2009 CC 003212 filed in Osceola County Public Records.

22) Attached hereto as Exhibit No. 22 is a true and correct copy of the Qualified Business

License for Sunshine Custom Builders, Inc.

23) Attached hereto as Exhibit No. 23 are true and correct copies of e-mails and documents between Sunshine Custom Builders, Inc., and Anthony Wright.

24) Attached hereto as Exhibit No. 24 is a true and correct copy of a February 5, 2008 from Anthony Wright to Sunshine Custom Builders, Inc.

25) Attached hereto as Exhibit No. 25 are true and correct copies of bank documents regarding the Change Order for Lot 29.

26) Attached hereto as Exhibit No. 26 are true and correct copies of closing documents from AmeraMortgage from Lot 29.

27) Attached hereto as Exhibit No. 27 are true and correct copies of bank documents from the January, 2008 draw request for Lot 29.

28) Attached hereto as Exhibit No. 28 are true and correct copies of bank documents from AmeraMortgage regarding Wrights' loan status for Lot 29 in January, 2008.

29) Attached hereto as Exhibit No. 29 are true and correct copies of bank documents of inspection reports regarding the draw that was never disperse to Sunshine Custom Builders, Inc.

30) Attached hereto as Exhibit No. 30 are true and correct copies of AmeraMortgage bank documents concerning the change order for Lot 29.

## B. Summary of Undisputed Facts and Evidence

Sunshine Custom Builders Inc. was incorporated on May 17, 2000 and was in good standing through all relevant periods of time in connection with the facts relevant in this case through 2008. (Ex. No.1, Paragraph 1, Ex. No.16 , p.1). The corporate status of

Sunshine Custom Builders Inc. was in full and lawful existence during the relevant periods of time in this case. (Ex. No.1 Paragraph 1; Ex. No. 16, p.1).

In 2004, the Defendants, Thomas F. Logan Jr. (hereafter, "Logan Jr.") and Thomas F. Logan III ( hereinafter, "Logan III") met with Plaintiff's Anthony and Karen Wright. In fact, Logan III, explained to Anthony Wright that he and his father incorporated Sunshine Custom Builders Inc,. to build homes in the State of Florida. Mr. Wright was interested in building homes in Reunion. Logan III had talked about the Legends Corner section of Reunion. Logan and Wright agreed to go forward with building two homes in Reunion's Legends Corner. (Ex. No.1, Paragraph 1).

It was agreed that the two homes would be constructed on Lot 29 and Lot 30. The contracts were signed and it was explained that work would begin once the infrastructure was completed by the developer Ginn. The estimated completion date of the new "West Side" section of Reunion was spring 2005.( Ex. No.1; Paragraphs 1 through 5; Ex. No.6, pp. 1 through 8; Ex. No. 7, pp. 1 through 8) In the spring of 2005, it was clear that the new phase would not be complete for at least a year. The roads, sewer, power, and other infrastructure of the new section had been delayed by hurricanes, lack of available labor caused by a booming market, and problems between Osceola County and Ginn. (Ex.No.1, Paragraph 6; Ex. No.2, pp. 22 through 24)

While waiting to begin construction on the homes, Sunshine became aware of the difficulties the Wrights were experiencing in obtaining financing for Lots 29 and 30. In view in Plaintiffs difficulty in obtaining funding, Anthony Wright asked Sunshine to make false statements to potential lenders. Specifically, he asked Sunshine to falsely state to American Dream Financing that deposits were received on Lot 29 when in fact they were for Lot 30 ( Ex. No. 1, Paragraph 6). Sunshine refused this request, because it was dishonest and illegal.

On February 16, 2005, Tony Wright sent an e-mail asking Sunshine to alter the contracts of each house and state an inflated false price of $ 1,650,000.00 to the bank, which was more than Sunshine originally agreed to build each home for. He wanted Sunshine to kick-back $150,000.00 of the bank's funds at closing on each home. (Ex No.1 Paragraph 6; Ex. No.4, p.. 65 through p. 67 ; Ex.No. 23 p. 33). Sunshine refused to participate in this kick-back scheme to defraud the lenders. However, Tony Wright was not finished. On February 23, 2005, Tony Wright sent another request to Sunshine. This time, he asked Sunshine to change the contract price on each home to $1,700,000.00. This time, Plaintiff Anthony Wright wanted to collect $200,000.00 kick-back on each home at closing. (Ex. No.1 Paragraph 6; Ex. No.4, p. 67 through 73; Ex No.23, p. 35). Once again Sunshine would not participate in these schemes to defraud financial institutions.

Further, Plaintiffs committed fraud in connection with their application's for mortgage with Amera on Lot 29. The Wrights failed to report all of the property owned with mortgages to other institutions, including Lot 30. (Ex. No.4 p. 46 through 56; Ex. No.23, pp. 37 through 42). At his deposition, Plaintiff Anthony Wright attempted to blame the mortgage fraud he perpetrated against Amera on some unknown individual named "Carlos". "Carlos" has never been seen or heard from in these proceedings and Defendants believe no such person ever existed.(Ex. No. 4 pp. 54 through 56). The existence of "Carlos" is irrelevant. Plaintiffs Anthony and Karen Wright signed these loan applications under penalty of perjury subjecting themselves to potential criminal liability under State and Federal Law for the intentionally material false statements each of them made to Amera.

In December 2006 , Ginn finally received the Certification of Completion from Osceola County for the infrastructure of the Legends Corner section of Reunion.( Ex. No.1 Paragraph 8; Ex No.11, p. 1; Ex. No.2 p. 23 through 24; Ex. No. 12, p. 1). The delay by Ginn had rendered it impossible for Sunshine to perform and begin construction for over two years after the time the contracts were signed. The market had boomed during the time and cost had sky-rocketed.

Sunshine was therefore, unable to lease Lot 30. The market had begun to shift significantly, as well, by the end of 2006. Sunshine informed the Wrights it was unable to the lease the home on Lot 30. (Ex. No. 1, Paragraphs 9 and 10).

The Wrights were not able to start Lot 29 simultaneously and requested that Lot 29 not start until Lot 30 was complete. Sunshine agreed to these terms and paid a settlement for the lease on Lot 29 to Tony Wright for $ 75,000.00 at the end of 2006. (Ex.No.1, Paragraph 10; Ex No. 23, p. 24; Ex. No.5, pp. 18 through 20; Ex. No. 4, pp. 19 through 20) Sunshine received draws from Amera from Lot 29 in August, September, October, and November. There were no issues with payment to the builder and not a single notice to owner filed on the property. Everyone was being paid and construction was moving quickly.(Ex. No.1, Paragraph 12; Ex. No. 3, pp. 69 through 70).

This all changed on January 4, 2008. Sunshine sent a draw request to Jana Kaminski with Amera , just as it had done for the last several draws.(Ex. No.1, Paragraph 13; Ex. 27 p. 3; Ex. 28, pp.11 through13). The inspector, Fabian Lazarte, came out to the property and authorized $ 130,500.00 draw for the work that had been completed in December, 2007.(Ex. No. 1 Paragraph 13; Ex. No. 27, pp. 11 through 12). However, Sunshine did not receive the draw as in prior months . This time, Jana Kaminski of Amera (i.e., Plaintiffs' lender for Lot 29), notified Sunshine and Logan III that the draw would not be funded due to the fact that the Wrights had not made the payment due at the end of December along with a loan renewal fee. ( Ex. No. 1 Paragraph 13; Ex. No. 28, pp. 11 through 13). Accordingly, Amera refused to continue funding and pay draw requests until Plaintiffs brought their loan to on time current status. ( Ex. No.1 Paragraph 13; Ex. No. 28, pp. 11 through 13).

Nearly two weeks passed, without pay of any kind on Sunshine's draw request. During this period, Anthony Wright sent an e-mail regarding the $100,000.00 for the home theatre to Amera. ( Ex. No. 1 Paragraph 13; Ex. No. 28, pp. 11 through 13). At this time, Anthony Wright proposed that he would make the payment to Amera for the amounts due in December and the renewal fee

in order to allow Amera to make the $ 100,000.00 draw for the home theatre for Lot 29 ( the wiring for the theatre had been completed) . Anthony Wright made the payment on January 14,, 2008. ( Ex. No. 1 Paragraph 13; Ex. No. 28, p.3) As a result, Sunshine received the $130,500.00 draw payment for work that was completed and performed by December, 2008.
( Ex. No. 1 Paragraphs 13 and 14; Ex. No. 27, p. 8). It should be noted, however, that Anthony Wright sent an e-mail to Jana Kaminski of Amera in early January, 2008, asking if he could receive the $ 100,000.00 draw for the home theatre rather than Sunshine. (Ex. No. 1 Paragraph 14; Ex No.28, p. 11) . Amera said no and that he was not entitled to it. (Ex. No. 3. pp. 73 through 74; Ex. No. 25, p. 4). Unkown to Amera, was a scheme Wright had proposed to defraud Amera. Wright proposed to Sunshine that he would pay his outstanding loan amounts so that Sunshine could refund $85,000.00 of the money back to Wright. By doing so and becoming current with Amera, Wright proposed to Sunshine that it immediately submit another draw request and receive payment from Amera. (Ex. 23, p. 28; Ex. 24, p. 1).

Unknown to Amera, the lender, the Wrights had already notified Sunshine that they were going to default on Lot 30 and Lot 29 and return to England. In short, in simple terms ,Wright asked the Plaintiffs in both telephone conversations and by e-mail to participate in a scheme to misapply the $85,000.00 draw amount at the expense of the lender, Amera. (Ex. No. 1, Paragraphs 14-16; Ex. No. 28, p. 11). Sunshine considered the proposal by Plaintiff Anthony Wright, but after reflection and thought, concluded that it was dishonest and therefore would not participate in the scheme. Instead, Sunshine paid the balance of the $85,000.00 to all the vendors and subcontractors it was required to pay in January and February 2008 as expected by Amera. (Ex. No. 1, Paragraphs 17 through 18; Ex. No. 3. pp. 73-74).

To more fully understand the issue before this court, Defendants offer the following details. Sunshine signed a change order with the Wrights for an additional charge of $100,000.00 to construct a home theater on Lot 29. (Ex. No. 1 Paragraph 15 ; Ex No. 9 pp. 1 through 2). It is not in dispute, that the change order payment for work performed on the home theater was to be

made as draw payment to Sunshine. This undisputed fact was confirmed on January 15, 2008, when Fabian Lazarte approved a draw payment to Sunshine for $ 100, 000.00 for the change order in connection with the home theater improvement .( Ex. No. 1 Paragraph 15 ; Ex. No. 30 pp. 4 through 6 ). It is also undisputed that Amera refused to allow Anthony Wright to receive these funds for this work. ( Ex. No. 1 Paragraph 14; Ex. No. 3 page 73 through 74).

Apparently, Plaintiff Anthony Wright believed Sunshine and Logan III would cooperate in his scheme to misapply funds and deceive Amera. Corroboration of Plaintiff Anthony Wright's scheme is reflected in his e-mail to Logan III in which he wrote: "…you should get all of your draw money …. I will be putting no more money into Reunion." (Ex No. 1 Paragraph 15; Ex No. 24, p.1). Apparently, Plaintiff Anthony Wright did not want Sunshine to be "burned" as a result of defaulting on Lot 29. Wright believed that Sunshine would have lost a separate draw payment owed in the amount $100,000.00 had Sunshine agreed to carry out the scheme. ( Ex. No. 1 Paragraphs 17 through 18). Despite the allegations of the Third Amendment Complaint, Sunshine received the draw payment on January 31, 2008, for Lot 29 as required under the contract and as approved by Amera for work performed, or to be performed , in connection with the home theater by Sunshine. (Ex. No. 1 Paragraph 15; Ex. No. 30 pp. 4 through 6; Ex. No. 3, pp. 73-75).

Sunshine continued work on the home through January, 2008. Sunshine had intentions to complete the home and informed Wright of this fact. By now, another draw for work completed in January was due. Logan III,, informed Tony Wright that he was not going along with his plan to scam the bank. He told Mr. Wright that Sunshine intended to finish the home and the money would be used to pay the theatre company. The large cost of the theatre would be paid after the carpet was installed. Since this was a few months away, Sunshine would not be spending these fund until the home was ready for the theatre components.( Ex No.1 Paragraph 15).

In February, 2008 Anthony Wright was informed by Sunshine and Logan III they were not going to pay Wright money that was not intended for him. Plaintiff Anthony Wright was furious for not agreeing with the scheme. (Ex. No. 1 Paragraph 16). Sunshine sent another draw request to Jana Kaminski, for money owed for work completed for January and February 2008. Fabian Lazarte was sent out to inspect the home. He wrote a report that approved the draw payment for $ 100,000.00 to Sunshine Custom Builders Inc. ( Ex. No. 1 Paragraphs 17 and 18; Ex. No. 29, pp. 2 and 3).

The bank would not fund this draw because; once again Wright was late on his Payment Sunshine Custom Builders never received the $ 100,000.00 draw approved by Fabian Lazarte. The Wrights owe Sunshine $ 100,000.00 plus loss profit that from not completing the home. (Ex. No. 1 Paragraph 17; Ex. No. 15, pp. 1 through 2). Anthony Wright not only let this home go back to the bank, as a search of Osceola County's public records revealed the Wrights had several more homes go into foreclosure. ( Ex. No. 1, Paragraph 18; Ex. No. 17, pp. 1 through 3; Ex. No. 18, pp. 1 through 3; Ex. No. 19, pp. 1 through 2; Ex. No. 20, pp. 1 through 3; Ex. No. 21, p. 1).

## III. Summary Judgment Standard and Argument

Under the Federal Rules of Civil Procedure (Fed.R.Civ.P.), a moving party is entitled to summary judgment if the pleadings, affidavits and other supporting documents show there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P., 56(c); Celotex Corp. v. Catrett,477 U.S. 317, 322, 91 L.Ed. 2d 265, 106 S.Ct. 2548 (1986). "The burden of establishing the absence of a genuine issue of material fact is on the party seeking summary judgment." United of Omaha Life Ins. Co. v. Sun Life Ins. Co. of America, 894 F.2d 1555, 1557 (11th Cir. 1990); See Also Morisky v. Broward County, 80 F.3d 445, 447 (11th Cir. 1996). Once

this burden has been met, the adverse party must show there remains a genuine issue for trial. Fed.R.Civ.P., 56(e). The court must view all evidence, including all the pleadings, answers to interrogatories, depositions, and admissions on file, together with any affidavits in the light most favorable to the non-moving party and must resolve all reasonable doubts about the facts in favor of the non-moving party." United of Omaha Life Ins. Co., 894 F.2d at 1558; See Whatley v. CNA Ins. Cos., 189 F.3d 1310, 1313 (11th Cir. 1999).

When looking at the facts in the light most favorable to the Wrights, the Defendants are entitled to judgment in their favor as a matter of law. At all relevant times in connection with the allegations of Third Amended Complaint, Logan III and Logan Jr., have acted in their capacities as officers of Sunshine Custom Builders, Inc, and not in their individual capacities. To the extent and filings made or liens made or recorded, such filings and/or recorded liens are those of Sunshine Custom Builders, Inc. In addition, not only was it impracticable for Sunshine to start construction on Lot 30 on time according to the construction contract, but the delay by Ginn, the developer of Reunion, had made it impossible for Sunshine to begin construction.

Furthermore, the Defendants refused to go along with the Wrights' scheme to misapply bank funds from the change order draw payment for Lot 29, which the Plaintiffs' inaccurate characterize as a separate "contingency fund." In addition, once the Wrights were notified that the Defendants could not leaseback Lot 30, the Plaintiffs failed to mitigate their damages in form of lost profits by failing to make arrangements for the property to be leased out by some other agent. Finally, the liens put on Lot 29 by two subcontractors after the property went into foreclosure were improper in their scope and

are no indication of Defendants' liability. The liens were filed long after Plaintiffs left were filed after the defaulted in undisputed facts and declaration.

- As the undisputed evidence has shown, the Plaintiffs have no evidence to support any of the essential elements associated with each of the causes of action alleged of: Conversion, Fraudulent Inducement (Draw Payment), Civil Theft (Draw Payment), Civil Theft (Illegal Disbursements), Civil Theft (Misapplication of Construction Funds), Breach of Leaseback Agreement, and Discharge of a Lien. The Defendants have not engaged in any fraudulent, dishonest, or illegal activities. After reviewing all of the undisputed evidence set forth herein and below, this court should dismiss each and every cause of action against the individuals and the corporate entity.

## IV. That Defendants Logan, III and Logan, Jr., cannot, as a matter of law, be sued in their individual capacity and the corporate shield under Florida law protects them.

All through their course of dealings with the Wrights over the construction of the homes on Lots 29 and 30 at Legends Corner, the actions of Logan III and Logan Jr. were at all times in their capacities as officers of Sunshine Custom Builders, Inc., and at no time did Logan III and Logan Jr. act in any other capacity with respect to Plaintiffs or the execution of agreements which are the subject of this lawsuit. For example the $75,000.00 check from Sunshine to the Wrights to release all claims on Lot 29 had typed on it in the upper left hand corner "Sunshine Custom Builders, Inc." (Ex. No.8, p.1). The claims brought by Plaintiffs against individual Defendants are invalid because all agreements were between Plaintiffs and Sunshine Custom Builders, Inc., and not the individual Defendants. Plaintiffs have failed to allege any acts or omissions that would warrant an imposition of liability against the individual Defendants.

Under Florida law, a corporation is a separate legal entity. This legal entity is distinct from its individual members, shareholders, subsidiaries, and affiliates, even where the corporation itself is closely held. See State ex rel. Continental Distilling Sales Co. v. Vocelle, 1946, 158 Fla. 100, 27 So.2d 728. In the United States, there exist many theories to lift or "pierce" the corporate veil in order to find individual liability. The most important of these theories in creating the piercing standard is the "alter ego" or "instrumentality rule." See In re Rodriguez, 895 F.2d 725, 728 (C.A.11 (Fla.), 1990).

All of these theories are predicated upon three basic prongs of "unity of interest and ownership," "wrongful conduct," and "proximate cause." Nevertheless, courts analyze all given factors when struggling with proof for each of the prongs. This approach is known as "totality of circumstances". Thompson, Robert B. (1991), "Piercing the Corporate Veil: An Empirical Study", *Cornell Law Review* **76**: 1036–1074.

In the instant case, Sunshine was a corporation duly registered or certified through a qualifying agent under Chapter 489 Florida Statutes when construction commenced on Lots 30 and 29 respectively. Logan III was acting on behalf of the corporate entity Sunshine Custom Builders, Inc., when he signed both contracts with the Wrights as an officer of the corporation. Looking at totality of the circumstances, there never existed any unity of interest and ownership between the individual Defendants and the corporate entity. At no time was there any wrong doing that was committed by any of the Defendants toward the Plaintiffs. Furthermore, no actions by the Defendants proximately cause any damage to the Plaintiffs. The harm which the Plaintiffs may have experienced resulted from Ginn not obtaining the proper Certificate of Completion by Osceola County for Lot 30 as well as the Plaintiffs defaulting on their mortgages on both Lots 29 and 30,

which resulted in foreclosure on both properties. In addition, Sunshine did not operate under any "improper purpose" concerning the management of its corporate funds. See Estate of Canavan v. National Healthcare Corp, 889 So.2d 825 (Fla. 2d DCA 2004). and Dania Jai-Alai Palace, Inc., 450 So.2d 1114 (Fla. 1984).

At the time, the contract between the Wrights and Sunshine was signed in 2004, the corporation was viable and in good standing as it was never dissolved because Sunshine meet the qualifications to be a corporation. In November, 2005, Sunshine was a qualified licensed contractor under Florida Law. As the Florida Supreme Court has commented recently in Horowitz v. Plantation General Hosp. Ltd., 959 So.2d 176, 182 (Fla., 2007). that in determining whether the Legislature intended or not to provide a private cause of action under Chapter 489 and concluded "… that there was 'no evidence in the language of the statute or the statutory structure that a private cause of action against a qualifying agent was contemplated by the legislature in enacting this statute.'" Ibid. quoting Murthy v. N. Sinha Corp., 644 So.2d 983, 986 (Fla.1994). The Court further stated that the language of the chapter indicated that the statutory provision was created merely to secure the public safety and welfare rather by the regulation of the construction industry. Id. Sunshine was qualified as a licensed contracting corporation when the building of the first of the Wright's home commenced. (Ex.No. 1, Paragraph 1; Ex. No. 22; Ex. No. 16, p. 1) It is an undisputed fact that all relevant times the relationship of the parties, Sunshine was a viable corporation and had not been dissolved. Plaintiffs have no standing or evidence to pierce the corporate veil.

## V. Phase II of Legend's Corner was not ready to be constructed upon because of a lack of infrastructure not provided for by the Developer Ginn which made performance by Sunshine impracticable if not impossible.

As discussed above, Phase II of Reunion called Legend's Corner was not ready during the operative time period to start on construction on Lot 30. The Developer did not get the authorization from the County government in order for Sunshine to commence construction on an empty tract of land, without any utility infrastructure and permits in place to begin the construction. As was stated in Florida Power & Light Co. v. Westinghouse Elec. Corp., 826 F.2d 239, 255 (C.A.4 (Va.), 1987) the defense of impracticability raises four factual questions which are articulated as: "1). Was performance as agreed rendered impracticable? (2) Did the claimed impracticability arise from an unforeseen contingency? (3) Was the non-occurrence of the contingency a basic assumption of the contract? (4) Did the parties, explicitly or implicitly, allocate the risk that the contingency would occur?"

In the instant case, the performance of building on Lot 29 was impracticable because there was no utility infrastructure to construct a home on an empty piece of land. Next, the impracticability arose from a lack of infrastructure upon the land, and the eventual obtainment of a Certificate of Completion from Osceola County, was an unforeseen contingency that neither the Plaintiffs nor Defendants were anticipating. The non-occurrence of the lack of a basic construction infrastructure from the developer Ginn was a basic assumption of the construction contract between the Wrights and the Defendants before building of the home could commence. Furthermore, the allocation that this contingency would occur was not implicitly or explicitly made allowance for by the parties other than Sunshine agreed to give the buyer additional time to get funding for the house, which by the time the Wrights were able to obtain the financing, Ginn received the Certificate of Completion from Osceola County for the Legends Corner section. This

was verified by the deposition testimony of Ginn's former sales representative Sean Barret. (Ex. No. 2, pp. 22-24). Additionally, Sunshine could not perform within the time period allowed for in the construction contract for Lot 30 because the corporation's insurance would not allow it to take the risk and expense of building on the land without the proper infrastructure. Not only was it impracticable for Sunshine to start construction on Lot 30 on time according to the construction agreement, but the delay by Ginn, as stated earlier, had made it impossible for Sunshine to begin construction for over two years since the signing of the construction contracts.

The Court in Florida Power & Light Co., held that under the Restatement of Contracts Section 454, that "…it is urged that American law recognizes that performance is rendered impossible if it can only be accomplished with extreme and unreasonable difficulty, expense, injury or loss." Ibid. at 55. Under the circumstances of this case, Sunshine could not perform under the contract without Ginn obtaining the proper Certificate of Completion from the County. In order for Ginn to get that Certificate it needed to resolve the infrastructure issues it had with Osceola County. Until that time, it would have been illegal, and thus impossible, for Sunshine to begin building on Lot 30 at that time. Accordingly, the courts have found that impossibility of performance as well as "acts of God" and "frustration of purpose" are "well-recognized defenses to nonperformance of a contract." See Mailloux v. Briella Townhomes, LLC, 3 So. 3d 394, 396 (Fla. 4th DCA), review denied, 14 So. 3d 1004 (Fla. 2009). Therefore, not only was it impracticable for Sunshine to start construction on Lot 30 in Legends Corner on time according to the agreement, but it was strictly impossible to begin that home without severe consequences to the corporation neither Sunshine nor Logan III and Logan Jr.

engaged in any dishonest or deceitful conduct that would warrant piercing the corporate in any event.

### VI. The Last Draw for the home theater for the home on Lot 29 was a Change Order that was approved by Amera, after inspection of the work was completed and approved, and not a separate "Contingency Fund" as the Plaintiffs have tried to characterize it.

To reiterate what was stated earlier, in or around early February of 2009, Plaintiffs' payment for his loan to the bank was again due and late. On February 3, 2009, Anthony Wright sent an e-mail to Logan III that he would not be paying any more money on the home at Reunion. Defendants knew Sunshine was due a draw for work completed in January of 2008. Plaintiffs also knew the same. What Anthony Wright proposed for consideration was the following: He was going to default on the home and not make any more payments to Amera. He wanted the Defendants to give him the balance of the $85,000.00 that was to be used for the home theater and he would make one more small payment to the bank so that Amera would not find Anthony Wright in default and therefore pay Sunshine for work completed in January of 2008, unrelated to the home theater for which Amera already funded Sunshine the $100,000.00.

The Plaintiffs have tried to characterized this change order to the price of the construction contract on Lot 29 as a separate "contingency fund" within its loan agreement with Amera used for paying for special features in the home, such as a home theater. There was no separate "contingency fund" under the parties' agreement or with any mortgage lending financial institution, namely; Amera. (Ex. No.26, pp. 62-66; Ex. No. 3, pp. 73-75). At no time were the Wrights entitled to the subject $85,000.00 dollar draw payment from Amera to Sunshine Custom Builders, Inc. The $85,000.00 complained

about by the Wrights in this Third Amended Complaint, were not funds issued by Amera for some sham contingency fund as alleged by Plaintiffs. Rather, these funds from Amera were directly dedicated to and intended for Sunshine Custom Builders, Inc., as a change order/draw payment for work on Lot 29 and to compensate and/or reimburses vendors and subcontractors who performed work as required under the contract to build Lot 29 and in connection with the relevant change order, namely, the home theater.

Subsequently, the Wrights asked Amera if it would release the subject draw payments to them rather than Sunshine. Plaintiffs were informed by Amera that at no time were they entitled to any draw payments made directly to them. Rather, the Plaintiffs were informed, and knew, that any and all draw payments were to be made to the order of Sunshine Custom Builders, Inc., the contractor. The $85,000.00 draw payment from Amera was used by Sunshine to pay vendors and subcontractors for work that was completed on the home, as required under all applicable agreements between the parties and Amera. Further construction on Lot 29 was not completed by Sunshine Custom Builders, Inc., because Plaintiffs deliberately defaulted on their contract with AmeraMortgage and fled to England.

Sunshine Custom Builders, Inc., was paid $15,000.00 cover cost for architecture work associated with an approved change order to build to build a home theater room with respect to Lot 29. The balance of the funds paid by Amera as draw payment to Sunshine Custom Builders, Inc., namely $85,000.00, was to pay for all vendors and subcontractors in connection with approved costs under the contract for Lot 29. When the Wright's defaulted on their mortgage, the bank did not pay the builder for anymore

work, even that which was completed. Accordingly, the builder did not have the funds to pay the subcontractors, because it was, in turn, not paid by Amera.

In short, Anthony Wright concocted a scheme to enlist the Defendants into a conspiracy to commit an "ongoing fraud" against a federally insured financial institution by misusing this change order as a separate "contingency fund." See Anderson v. Amberson, 905 So.2d 811 (AL, 2004), Lopez-Infante v. Union Central Life Insurance Co., 809 So.2d 13 (Fla.Dist.Ct. App.2002), and Lowe v. Presley, 86 Ga. App. 328, 71 S.E.2d 730 (1952). This scheme against Amera involved the misapplication of these funds which, if the Defendants had agreed to and carried out, would have exposed them to criminal liability under Title 18 United States Code Sections: 371 (conspiracy) and 2 (aiding and abetting), 1344 (bank fraud), and 656 (misapplication of bank funds). The Wrights' scheme to defraud Amera was simple.

Anthony Wright proposed the $85,000.00 balance of funds that were promised by Plaintiffs and Defendants to be used exclusively for the completion of the home theater would instead be misapplied and diverted to Plaintiffs and Defendant Sunshine would still receive payment for work it, in fact, was owed for January of 2008. Knowing as Sunshine did that Anthony Wright intended to default on the note to the Bank (forcing foreclosure), Anthony Wright believed that he and Sunshine would get money illegally diverted and misapplied, but that it was worth it because Anthony Wright was defaulting on the note and returning to England hoping to leave with $85,000.00 of bank money and no home theater completed. He told the Defendants that they could stop work on the home theater and let the bank eat the loss of nearly $100,000.00 with both of them walking away with money in their pockets.

The Defendants thought about the matter, and after considering the fact that it would constitute a fraud against a federally insured institution and would be deceitful causing economic damage to an innocent insured bank, they declined to participate in a conspiracy to misapply bank funds and defraud Amera. The Plaintiffs scheme was illegal and they refused to refrain from pursuing it. Attached and incorporated herein by reference, as ( Ex .No. 23; p. 28; Ex. No.24, p. 2) are the certain emails dated February 3, 2008 and February 5, 2008 consistent with the telephone conversations with Defendants regarding Plaintiffs' scheme and artifice to defraud the Amera. Defendants used the proceeds to pay off vendors and subcontractors for work that was done and for some pre-wiring of the home theater, just as promised to the bank to avoid defrauding the institution and continued completion of the home when it went into foreclosure to minimize losses to the bank. Defendants acted honorably, despite the solicitation to defraud a bank. Plaintiffs now sue the Defendants for not making the payment of $85,000.00 to them. The lawsuit itself is a sham by using the judicial process as their vehicle to illegally prosper and benefit from their misconduct described above.

**VII. Once the Defendants notified the Plaintiffs that they would not lease the home on Lot 30, Plaintiffs subsequently failed to mitigate their damages. In fact, there is not Breach of the Leaseback Agreement because once the Plaintiffs were so notified the mortgage was immediately defaulted upon and the home went into foreclosure.**

Defendants allege that before commencement of this action, the Defendants duly performed, satisfied and discharged all duties and obligations he may have owed to the Plaintiffs arising out of any and all agreements, representations or contracts made by or on behalf of these answering Defendants, such that this action is barred by the provisions under Florida Law. In addition, Sunshine Custom Builders, Inc., tendered a $75,000.00

check to Plaintiffs for a release to any and all claims Plaintiffs may have against Defendants in connection to Lot 29.

Looking at Lot 30, the Wrights failed to mitigate their damages by failing to lease the premises, or finding an agent to lease the premises, once they were notified that the Defendants were not able to meet their obligation to lease the premises, because of the economic downturn in the economy. As a consequence, the Plaintiffs' are suing the Defendants for the lost profits from not having the property leased. The issue then becomes if the breach of the leaseback resulted in "lost profits," such as those as the Plaintiffs argue in the current case, are "consequential damages" calling into effect the "cover" or "loss mitigation provision" of Fla.Stat.Ann. Sec. 672.715(2)(a). See Nyquist v. Randall, 819 F.2d 1014, 1017 (C.A.11 (Fla.), 1987).

"Lost profits" are typically considered by most Florida courts to be "consequential damages. Accordingly, "…lost profits may indeed be the quintessential example of 'consequential damages.'" Ibid. at 1018. Historically, consequential damages are those that flow naturally from the breach of contract "…in the great multitude of such cases occurring under ordinary circumstances…." Id. at 1018 ( Quoting Hadley v. Baxendale, 156 Eng.Rep. 145,151 (Exch.1854), the common law case that set the foundation of the modern law of consequential damages). In most cases such damages are not recoverable unless they "could not reasonably be prevented by cover or otherwise." Id. (citing Fla.Stat.Ann. Sec. 672.715). In the instant case, the Plaintiffs could have reasonably attempted to lease the premises once they had been notified that the Defendants were unable to so under the leaseback agreement. The Plaintiffs failure to mitigate their alleged damages bars each of the Plaintiffs' claims against the Defendants or, in the

alternative; it reduces the Plaintiffs' right of recovery by that amount which said failure contributed to the alleged damaged claimed in the Third Amended Complaint, if any.

In fact, on Lot 29, after the bank notified the Plaintiffs that they were not entitled to the money for the last change order, the Defendants had paid the Plaintiffs $75,000.00 for the release from the Leaseback Agreement on that property. Subsequently, the Plaintiffs stopped paying the mortgage on that home. Consequently, the Plaintiffs have no damages for that home because Amera stopped paying for the construction after that property went into foreclosure. The Defendants never received the $100,000.00 draw and never received profits that would have come with completion of the home on Lot 29. As a consequence, the claims of the Plaintiffs as to the $85,000.00, the Court should find that there are not facts to dispute those funds belonged to the Defendants. Accordingly, the Defendants respectfully move to have the Court dismiss those claims by the Plaintiffs.

Additionally, once the Defendants notified the Plaintiffs that they would not lease the home on Lot 30, Plaintiffs subsequently failed to mitigate their damages. In fact there is no breach of the Leaseback Agreement for that property, because once the Plaintiffs were so notified of the non-leasing of the lot, the mortgage was immediately defaulted upon by Anthony Wright and the home went into foreclosure. As far as leasing Lot 30, this home already was in foreclosure. As a consequence, as a matter of law the Court should find that Plaintiffs have no damages for Lot 30 as well.

## VIII. The Liens put on Lot 29 by Subcontractors, the liens put on the property by Futrell Custom Pools and Cross Electric were improper and are no indication of Defendants' liability for nonpayment.

Both liens that were eventually put on Lot 29 by two subcontractors, Futrell Custom Pools and Cross Electric of Central Florida occurred after both homes went into foreclosure. (Ex. No. 13, p. 2 ; Ex. No. 14, p.1 ). In , Zalay v. Ace Cabinets of Clearwater, Inc., 700 So.2d 15, 17 (Fla.App. 2 Dist., 1997), the court examined Florida Statutes section 713.06(1) to see what amount that subcontractors can place upon a property for work completed. Accordingly, the court found under the statute that subcontractors can place leans for money owed for labor, materials, services furnished under their contract with the contractor and the "direct contract" between the home builder and contractor. In addition, "[t]he total amount of all liens allowed under this part for furnishing labor, services, or material covered by any certain direct contract must not exceed the amount of the contract price fixed by the direct contract except as provided in subsection (3)." Ibid.

Neither subcontractor ever filed and sent notice to owner to Amera as required by law. (Ex. No. 3, pp.69 through 70). Furthermore, the liens are for the full amount of the contact for the home, as if the work was completed. As a consequence, the liens are improper. Each subcontractor got paid for the work that they completed. The reason they did not get paid is because the house on Lot 29 was not completed as a result of the Plaintiffs not paying their mortgage on it and allowing the property to go into foreclosure. Once the property went into foreclosure, Amera stop funding the project the contractor stopped construction, which included the completion of the work of the two subcontractors. Therefore, Sunshine did not misapply funds by not paying the two subcontractors in question, and there is no liability of Defendants as a result of not paying the subcontractors for work which was not, and could not, be completed. Additionally,

these liens are irrelevant because Wright eventually left for England. Also, Wright has no standing to bring the argument because he was not entitled to the $85,000.00. (Ex. No. 1; Paragraphs 14 through 16).

## IX. **Conclusion**

Defendants seek Summary Judgment against Plaintiffs with respect to the individualized claims against Defendants Thomas F. Logan III and Thomas F. Logan Jr., for they cannot be sued under Florida law as there are no grounds to pierce the corporate veil. At no time were Logan III and Logan Jr. acting in any capacity than that for the corporate entity, Sunshine Custom Builders, Inc. Second, it was impracticable if not impossible for Sunshine Custom to build on Lot 30 in Phase II of Legend's Corner Reunion housing development on the specified contract date, because a lack of infrastructure not provided for by the Developer Ginn. The developer neither obtained in time a Certificate of Completion from Osceola County.

As a matter of law, no fraud or other individual claims may be brought against the Defendants for individual misconduct as the Plaintiffs were not allowed to receive those draw funds from the bank. The last draw for the home theater for the home on Lot 29 was a Change Order that was approved by the bank, after inspection of the work was completed and approved, and not a separate "Contingency Fund." Turning to on Lot 29, after the bank notified the Plaintiffs that they were not entitled to the money for the last change order, the Defendants had paid the Plaintiffs $75,000.00 for the release from the Leaseback Agreement on that property. Subsequently, the Plaintiffs stopped paying the mortgage on that home.

Consequently, the Plaintiffs have no damages for that home because the bank stopped paying for the construction after that property went into foreclosure. The claims by Plaintiffs against the Defendants concerning the $85,000.00 change order should be dismissed because there are no facts to dispute those funds belong to the Defendants, because they never received the $100,000.00 draw. The Defendants, thus, never received profits that would have come with completion of the home on Lot 29.

The Plaintiffs have no damages on Lot 30. The Defendants completed the home at the agreed upon price. As soon as the Defendants notified the Plaintiffs that they would not lease the home on Lot 30, Plaintiffs subsequently failed to mitigate their damages. In reality, there is no breach of the Leaseback Agreement, because once the Plaintiffs were so notified the mortgage was immediately defaulted upon and the home went into foreclosure. As far as leasing Lot 30 further, this home already was in foreclosure.

Furthermore, the liens put on the property by two subcontractors after Lot 29 went into foreclosure were improper because they were for the full amount of the price of the contact for the work on the home, as if the work was completed. Both subcontractors got paid for the work that they completed. Additionally, no notice to owner was sent to the loaning institution. Once the property went into foreclosure, the bank stop funding the project the contractor stopped construction, which included the completion of the work of the two subcontractors. Therefore, Defendants did not misapply the funds it received by not paying the two subcontractors in question for work that was not completed, and therefore there should be no judgment of liability on the Defendants part as argued by the Plaintiffs in their Third Amended Complaint.

Therefore, as the undisputed evidence has shown, the Plaintiffs have no evidence to support any of the essential elements associated with each of the causes of actions alleged in their Third Amended Complaint. These elements were that of Conversion, Fraudulent Inducement (Draw Payment), Civil Theft (Draw Payment), Civil Theft (Illegal Disbursements), Civil Theft (Misapplication of Construction Funds), Breach of Leaseback Agreement, and Discharge of a Lien. Neither the individual Defendants nor the corporate Defendant has engaged in any dishonest, fraudulent, or illegal activities. Accordingly, after receiving all of the undisputed evidence set forth herein and below, this Court should dismiss each and every cause of action against the individuals and the corporation.

Respectfully Submitted,

/s/ Joseph N. DeBaise, II
JOSEPH N. DeBAISE, II, Esq..
Florida Bar No.: 0022492
THE LAW GROUP OF JOSEPH N. DeBAISE, II, L.L.C.
600 North Thacker Avenue, Suite B5
Kissimmee, Florida 34741
Tel/Fax: (407) 994-2975
Email: jdebaise@cfl.rr.com
Attorney for Defendants

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that I electronically filed the foregoing Defendants' Consolidated Motion for Summary Judgment, Memorandum of Law and Supporting Evidence against Plaintiffs with Connection with the Plaintiffs' Third Amended Complaint, on this 22nd day of February, 2010, by using the CM/ECF system which will automatically send copies of this motion to all counsel of record.

By: /s/ Joseph N. DeBaise, II
JOSEPH N. DeBAISE, II, Esq..
Florida Bar No.: 0022492
THE LAW GROUP OF JOSEPH N. DeBAISE, II, L.L.C.
600 North Thacker Avenue, Suite B5
Kissimmee, Florida 34741
Tel/Fax: (407) 994-2975
Email: jdebaise@cfl.rr.com
Attorney for Defendants